# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

ALAN BRUCE CARPENTER,                          FILE NO. 14-CV-1664 (JRT/TNL)

       PLAINTIFF,

V.                                             **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

       DEFENDANT.

---

      Lionel H. Peabody, Peabody Law Office, P.O. Box 10, Duluth, MN 55801, for Plaintiff; and

      Pamela Marentette, Assistant United States Attorney, 600 United States Courthouse, 300 S. 4th Street, Minneapolis, Minnesota 55415, for Defendant.

## I.    INTRODUCTION

    Plaintiff Alan Bruce Carpenter brings the present action, disputing Defendant Commissioner of Social Security's denial of his application for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the parties' cross motions for summary judgment. For the reasons set forth herein, this Court will recommend Plaintiff's Motion for Summary Judgment (ECF No. 17) be granted in part and denied in part, the Commissioner's Motion for Summary Judgment (ECF No. 21) be granted in part and denied in part, and this matter be remanded for proceedings consistent with this opinion.

## II.  FACTS

### A. Procedural History

Plaintiff first filed for DIB and SSI in September of 2008, alleging disability beginning April 1, 2006 due to chronic back pain. (R. 311-329.) Following a hearing in front of an Administrative Law Judge ("ALJ") on August 18, 2010, Plaintiff's claim was denied on October 25, 2010. (R. 107-124.) In the time between the ALJ hearing and the issuance of the ALJ's decision, Plaintiff was hospitalized for suicidal ideation. (R. 923-30.) Plaintiff filed a request for review by the Appeals Council (R. 240) and a second application for benefits alleging disability with an onset date of October 26, 2010. Plaintiff's second applications were initially denied, (R. 1159, 1171), and Plaintiff filed a request for reconsideration of that denial on June 1, 2011. (R. 1174.) Upon reconsideration by the state-agency disability determination service ("State Agency"), Plaintiff's second application for benefits was granted on October 12, 2011, and Plaintiff was found to be disabled as of October 26, 2010. (R. 125-44.)

On June 8, 2012, the Appeals Council informed Plaintiff that it had granted his request to review the ALJ's October 25, 2010 decision denying benefits. (R. 260.) The Appeals Council also informed Plaintiff that it was proposing to reopen the State Agency's favorable determination on his later applications dated October 12, 2011. (R. 260.) The Appeals Council stated that it was seeking to review Plaintiff's case because "there is new and material evidence and the decision is contrary to the weight of all the evidence now in the record." (R. 260.) The Appeals Council's notice also provided that it was able to reopen the favorable determination because "the notices of the initial

determinations are dated October 12, 2011," and the Appeals Council may reopen and change a determination within 12 months of the date of the notice of the initial determination for any reason. (R. 260-61.)

A second ALJ hearing occurred on December 5, 2012. (R. 71-102.) In his February 1, 2013 opinion (R. 8-33), the ALJ concluded as follows: Plaintiff has not engaged in substantial gainful activity since April 1, 2006. (R. 14.) Plaintiff suffered from obesity, history of bladder cancer with treatment and no recurrence, degenerative disk disease of the lumbar spine, degenerative changes of the shoulders, depression, and symptoms of anxiety. (R. 14.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.) Plaintiff had the residual functional capacity ("RFC") to

> [p]erform sedentary work as defined in 20 C.F.R. 404.1567(a) and
> 416.967(a) except that [Plaintiff] requires a sit/stand option with no
> more than occasional stooping, kneeling, crouching, crawling or
> climbing ladders, ropes or scaffolds. [Plaintiff] is limited to frequent
> balancing and climbing of ramps and stairs. [Plaintiff] is further
> limited to unskilled or semi-skilled work with no rapid pace or high
> production requirements, and is limited to brief and superficial
> contact with others.

(R. 16.) Plaintiff was unable to perform any past relevant work, but considering his age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform, including final assembler, fishing real [sic] assembler, lampshade assembler, sorter, and dresser. (R. 24-25.) The ALJ concluded that

Plaintiff had not been under a disability within the meaning of the Social Security Act since April 1, 2006. (R. 25.)

Plaintiff requested review of the ALJ's decision, and the Appeals Council denied the request. (R. 1-5.) This action followed.

### B. Employment Background

Plaintiff worked as a truck driver for Hoover Construction Company from 1998 to 2006. (R. 380-81.) Plaintiff has not worked since 2006.

### C. Medical Records

Plaintiff developed low back pain in October of 2005. (R. 571.) An MRI in November of 2005 showed degenerative disk disease and degenerative joint disease within the lumbar spine greatest at the L4-5 and L5-S1 intervals. (R. 564.) Plaintiff was diagnosed with disk herniation at the L4-5 level with a small focal disk protrusion at the L5-S1 level. (R. 564.) A subsequent MRI on July 27, 2006, showed degeneration and dehydration of the L4-5 disk with disk space narrowing, as well as annular bulging of the L4-5 disk with a small central disk protrusion producing ventral effacement of the dural sac. (R. 562.) The July 2006 MRI also showed degeneration and dehydration of the L5-S1 disk with broad-based disk protrusion posterolaterally on the right, contacting and displacing the right S1 nerve root. (R. 562.)

Plaintiff suffered a sudden onset of severe back pain after stepping out of the shower on July 28, 2006. (R. 585.) Plaintiff complained of numbness and weakness in both legs. (R. 585.) Plaintiff appeared in a great amount of discomfort and straight leg raises were positive bilaterally. (R. 585.) On July 29, 2006, Plaintiff was brought to the

emergency room by ambulance after falling and being unable to get up. (R. 558-61.) Plaintiff complained of debilitating leg pain radiating down both legs, mainly on the right. (R. 558-61.) He was admitted for pain management and was prescribed Toradol and Demerol. (R. 558.)

Dr. Mark D. Wagner, M.D., Plaintiff's primary physician, noted on August 1, 2006, that Plaintiff had experienced increased symptoms in the last four days. (R. 587.) Upon examination, Dr. Wagner found Plaintiff's range of motion to be limited in all planes. (R. 587.) Dr. Wagner also found that Plaintiff needed crutches to ambulate and restricted Plaintiff from working. (R. 587.)

Dr. Eric W. Rudd, M.D., a neurosurgeon, evaluated Plaintiff on September 28, 2006. (R. 517-19.) Upon examination, Dr. Rudd noted that Plaintiff ambulated with a slow but structurally normal gait pattern, albeit with moderate antalgia favoring the left side. (R. 518.) The spine had no evidence of pathologic curvature, and Plaintiff was nontender in the lumbar midline. (R. 518.) Plaintiff was able to heel and toe walk without difficulty, and lower extremity motor and sensory exams were intact. (R. 519.) In Dr. Rudd's assessment, Plaintiff's MRI showed evidence of disk protrusions at L4-5 and L5-S1. (R. 519.) Dr. Rudd also noted that Plaintiff complained of left leg paresthesia, but opined that this seemed to be a subjective complaint lacking in objective substantiation as Plaintiff's disk protrusions were acentric to the right, suggesting a mismatch between pathology and symptomatology. (R. 519.) Dr. Rudd opined that Plaintiff's degenerative disk disease would "undoubtedly pose limitations in [Plaintiff's] return to vigorous lifting work." (R. 519.)

Plaintiff saw Dr. Rudd again on November 16, 2006 for a follow-up appointment. (R 522-23.) At that appointment, Plaitniff's neurologic examination remained intact, and electrodiagnostic studies showed a normal EMG of the legs without electrophysiologic evidence of radiculopathy." (R. 522.) Dr. Rudd did not recommend surgery and remained "doubtful that additional palliative treatment will be curative, particularly since his subjective complaints are lacking in objective substantiation." (R. 523.)

On December 8, 2006, Plaintiff saw Dr. Thomas S. Douglass, M.D., an occupational medicine specialist. (R. 529-32.) Plaintiff continued to have good days and bad days, and an examination revealed spasm in the left lumbar paraspinal muscle area. (R. 531.) Dr. Douglass recommended that Plaintiff undergo physical therapy and opined that, in his estimation, Plaintiff was "able to do primarily sedentary classification of work and recommend[ed] limiting his lifting/carrying to 10 lb. occasionally." (R. 532.)

On January 2, 2007, Plaintiff reported having been to physical therapy, but still experiencing aching pain and soreness in his lower back, stiffness, occasional sharp shooting pains up to two or three times a day, numbness, and tingling. (R. 533.) On January 23, 2007, Dr. Douglass noted that Plaintiff thought his back was getting stronger. (R. 535.) Plaintiff complained of a couple of recent flare-ups of pain, one of which came after using an ice augur. (R. 535.) Dr. Douglass continued Plaintiff's work restrictions, limiting him to primarily sedentary classification type work with the ability to get up and move around on a limited basis as tolerated. (R. 536.)

On February 12, 2007, Plaintiff reported a flare-up in his lower back pain during the preceding week that caused him to cut back on his exercises. (R. 538.) Upon

examination, Plaintiff sat with mild discomfort and displayed an obvious tilt of his lumbar spine at the L5-S1 level to the left. (R. 539.) Dr. Douglass noted loss of normal lumbar lordosis, spasm in his lower back, and pain when Plaintiff attempted to walk on his toes. (R. 539.)

Plaintiff returned to Dr. Douglass on March 6, 2007. (R. 541-42.) Plaintiff complained of increased pain after getting out of the bathtub two days earlier. (R. 541.) Plaintiff rated his pain as a 6 out of 10. (R. 541.) Upon examination, Plaintiff had considerable difficulty transitioning from sitting to standing, stood with a slight forward tilt, and showed a rather marked lateral tilt at L5-S1. (R. 542.) Plaintiff also displayed limited range of motion and marked spasm across his lower back. (R. 542.) Dr. Douglass opined that Plaintiff could likely not work because he is too uncomfortable sitting and standing and transitioning to work effectively. (R. 542.)

Plaintiff's physical therapist noted that Plaintiff was much worse on March 7, 2007. (R. 659.) Plaintiff rated his pain a 9 out of 10 and needed assistance with bed mobility and sit-to-stand transfers. (R. 659.) On March 9, 2007, Plaintiff canceled his appointment, stating that he could not get out of bed because of his back pain. (R. 658.)

Plaintiff returned to Dr. Douglass on March 27, 2007, reporting that his pain was a 3 to 4 out of 10. (R. 544.) Plaintiff still moved slowly in apparent discomfort when transitioning from sitting to standing and showed a lateral tilt to the left, but he walked without a limp. (R. 545.) Dr. Douglass released Plaintiff to light work activity with bending maximum of 30 degrees, a lifting/carrying maximum of 10 pounds, and ordered

that he avoid repeated bending and twisting, and working in awkward positions. (R. 545.)

Dr. Douglass also recommended that Plaintiff not lift anything below his knees. (R. 545.)

On April 13, 2007, Plaintiff reported to Dr. Douglass that he felt his back was getting stronger with physical therapy, but he still experienced considerable pain. (R. 547.) After a physical examination, Dr. Douglass noted that Plaintiff was still significantly limited in his capabilities for work activity:

> Primarily sedentary classification of work with ability to get up and move around on a limited basis as needed. Lifting/carrying 10 lb. maximum. No climbing ladders. No repeated bending or twisting or working in awkward positions. He needs to be able to sit and stand and walk and change positions frequently as needed. No driving heavy trucks or heavy equipment that causes excessive jarring of the back. No lifting below his knees. No prolonged driving. Short distances only. No jarring of his back.

(R. 548.) On April 16, 2007, Dr. John Dowdle, an independent medical examiner, opined that Plaintiff's leg pain, paraspinal muscle spasm, and limited motion appeared related to the facet inflammation. (R. 362-71.) Dr. Dowdle further opined that Plaintiff "requires permanent work restrictions including a lifting limit of 30 pounds, avoidance of repetitive bending and avoidance of prolonged single positions." (R. 370.)

On September 14, 2008, Plaintiff arrived in the emergency room. (R. 555.) Plaintiff had fallen four days previous while helping his wheelchair-bound relative down some stairs. (R. 555.) Plaintiff "tumbled down the stairs in a bouncing, sitting position," and his pain had steadily increased every day. (R. 555.) He received Toradol, Vistaril and morphine in the hospital and was discharged with prescriptions for Naprosyn, Flexeril, and Percocet. (R. 556.) Plaintiff followed up with Dr. Wagner on September 15, 2008.

(R. 589.) Plaintiff reported to Dr. Wagner that the pain was keeping him from performing recreational activities or work. (R. 589.) Plaintiff was given Toradol, Phenergan, and Vistaril by injection. (R. 590.)

On October 27, 2008, Dr. Wagner wrote a letter setting forth Plaintiff's condition as follows:

> [Plaintiff] has chronic pain due to lumbar disk disease, which prevents him from participating in recreational and work activities. From a physical capacities standpoint, he is limited to sedentary activities; require the ability to shift from sit to stand to walk frequently as needed; must avoid repetitive tasks involving twisting/bending; must avoid jarring activities[.] Even with these restrictions, [Plaintiff] is likely to miss work 3 or more times per month because of unexpected flare ups causing severe back pain. He does use medication such as Oxycodone on an ongoing basis.

(R. 598.)

In March 2010, Plaintiff was diagnosed with grade 3/3 non-invasive transitional cell carcinoma of the bladder. (R. 690, 703.) The tumor was surgically removed, and Plaintiff underwent a 6-week course of chemotherapy. (*See* R. 703.) Subsequent exams showed no evidence of tumor recurrence. (R. 943-44, 939, 981, 1086, 1096.)

On August 16, 2010, Plaintiff saw Dr. Francis Denis, M.D., a neurosurgeon at Twin Cities Spine Center. (R. 880.) Plaintiff described his pain as 100 percent low and mid back pain, rating it a 3 or 4 out of 10. (R. 880.) Plaintiff also reported numbness, tingling, burning from his left groin to his left knee, and some leg weakness. (R. 880.) Plaintiff stated that bending, twisting, driving a car, and most activity aggravated his symptoms. (R. 880.) Upon physical examination, Dr. Denis noted that Plaintiff displayed lumbosacral tenderness, no sciatic notch tenderness, and normal sensation in the L3, L4,

L5, and S1 dermatomes bilaterally. (R. 881.) Plaintiff's straight leg raise reproduced back pain at about 70 degrees bilaterally. (R. 881.)

Dr. Denis ordered an MRI. (R. 898-99.) The MRI revealed degenerative changes with relatively mild stenosis at the L4-5 level being produced by bulging of the disk eccentric to the left. (R. 899.) The MRI also showed mild bulging of the L5-S1 disk eccentric to the right. (R. 899.) Dr. Denis wrote that the MRI did not show overwhelming findings, but some pressure at the L4-5 level might be responsible for some of Plaintiff's left leg symptoms. (R. 908.)

### D. Residual Functional Capacity Assessment

Dr. Gregory H. Salmi, M.D., performed a physical RFC assessment on November 14, 2008. (R. 602-09.) Dr. Salmi opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and stand and/or walk at least 2 hours in an 8-hour workday, and required no limitations on pushing or pulling other than the weight restrictions on lifting. (R. 603.) Dr. Salmi explained his opinion as follows:

> [Plaintiff] has experienced chronic pack bain since 2005, in a vehicle accident at work [sic]. He re-injured his back in 2006, also at work. The MRI in 2006 showed bulging L4-5 with small central disk protrusion, as well as dehydration of L5-S1, with broad-based disk protrusion, and S1 nerve root displacement. Spine Xrays found some mild degenerative changes, such as osteophytes and bulging discs. Some loss in height has been noted in late 2006. The NH has undergone various types of treatment for his condition, such as painkillers, muscle relaxants, ibuprofen, facet injections, and epidural steroid injections. His EMG, done in 11/2006, was normal.

(R. 603.) Dr. Salmi further opined that Plaintiff could frequently climb ramps and stairs; frequently balance; occasionally climb ladders, ropes and scaffolds; and occasionally

stoop, kneel, crouch, and crawl. (R. 604.) Dr. Salmi noted that the objective physical evidence in Plaintiff's record indicated a greater functional ability than the allegations suggested. (R. 607.)

### E. August 18, 2010 Administrative Hearing

A hearing before the ALJ occurred on August 18, 2010. (R. 71-102.) Plaintiff testified about his condition as follows: Driving is really hard on his back, and he can drive about half an hour before he has to stop. (R. 81.) If his back is "out," he cannot drive at all. (R. 81.) On a good day, he can easily walk a couple of blocks; on a bad day, he cannot walk "even to the bathroom." (R. 83.) His back will go out every four to five weeks, and it will affect him for up to two weeks. (R. 83-84.) Sometimes it gets so bad that he cannot get out of bed. (R. 84.) Plaintiff has been prescribed a back brace that he uses when his back is very bad and he cannot stand at all. (R. 85-86.) In September of 2008, he fell down the stairs when he was trying to help a relative in a wheelchair get down the stairs. (R. 88.) When Plaintiff is sitting for any amount of time, he has to change positions very often. (R. 90.) He also has a problem with standing and never really stands in the same position for very long. (R. 90.) His back pain gives him difficulty doing light housework because he cannot bend over. (R. 90-91.) He feels safe lifting 10 pounds and lighter, but more than that will cause his back to go out. (R. 91.) He has a sharp pain in his back and a dull pain in his left leg. (R. 91-92.) When his back goes out, Plaintiff treats it with Lortabs and Tylenol. (R. 92.) This usually eases his pain, but when his back is totally out, it does not ease the pain at all. (R. 92.) Plaintiff likes to hunt and fish, but his back pain makes him sit in the vehicle more than he used to. (R. 94.)

Mary Harris testified as a vocational expert. (R. 95-100.) The ALJ presented Harris with several hypothetical individuals, each with limitations similar to those testified to by Plaintiff. The first hypothetical assumed an individual limited to lifting 20 pounds occasionally and 10 pounds frequently, on his feet not more than two hours per day, and "additionally limited from postural motions, like no more than occasional stooping and kneeling, crouching and crawling, no more than occasional ladders, ropes, scaffolds, though he could frequently balance and use ramps and stairs." (R. 96-97.) This hypothetical individual had no mental impairment that would impose other nonexertional limitations. (R. 97.) Harris testified that an individual with those limitations could perform work as a delivery driver, and that a significant number of those jobs existed in the national economy. (R. 98.) Harris further testified that such an individual could perform jobs at the unskilled level, such as cashier, and that a significant number of those jobs existed in the national economy. (R. 98.)

The ALJ's second hypothetical assumed an individual limited to the sedentary level, "both as to lifting and time on feet, and also require that there be a sit/stand option, essentially sit/stand at will." (R. 98.) Harris testified that an individual with those limitations could still perform jobs at the unskilled level, such as cashier and gate guard, and that a significant number of those jobs existed in the national economy. (R. 98.)

The ALJ's third hypothetical assumed an individual further limited such that he must avoid repetitive tasks involving twisting and bending, must avoid jarring activities, and even with these restrictions, he is likely to miss work three to four times per month.

(R. 99.) Harris testified that such an individual could not perform any jobs in the national economy. (R. 99-100.)

### F. Intervening Hospitalization and Additional Medical Records

On September 22, 2010—after Plaintiff's hearing in front of the ALJ but before the ALJ issued a decision—, Plaintiff was hospitalized for suicidal ideation. (R. 923-30.) Plaintiff was placed on 72-hour hold. (R. 923.) Plaintiff underwent a behavioral health evaluation on September 23, 2010. (R. 923.) Plaintiff had normal speech and neutral mood, a coherent thought process, and maintained good eye contact. (R. 923.) Plaintiff was diagnosed with depression, anxiety, and suicidal ideation. (R. 924.) Plaintiff refused antidepressants upon discharge. (R. 926.)

### G. October 25, 2010 ALJ Decision

On October 25, 2010, the ALJ issued a decision denying Plaintiff's first applications for benefits. (R. 107.) The ALJ found as follows: Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011. (R. 112.) Plaintiff had not engaged in substantial gainful activity since April 1, 2006. (R. 112.) Plaintiff has the following severe impairments: obesity; status post bladder cancer with treatment (non-invasive transitional cell carcinoma) with abdominal pain; and degenerative disk disease of the lumbar spine, status post roll over accident. (R. 112.)

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 113.) The ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of

13

any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment," and that Plaintiff "did not have the necessary neurologic findings in order to meet or equal" Listing 1.04. (R. 113.) Specifically, the ALJ noted that "[w]hile [Plaintiff's] MRI revealed likely nerve root impingement, [he] did not have the necessary neurologic findings in order to meet or equal the listing. Consistently [Plaintiff] had normal motor function, normal reflexes and normal sensation." (R. 113.)

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he "must have a sit/stand option at will and must not perform more than occasional stooping, kneeling, crouching, crawling or climbing ladders, ropes or scaffolds," and he "should avoid more than frequent balancing and climbing ramps and stairs." (R. 113.)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" to the extent they were inconsistent with the ALJ's functional capacity assessment. (R. 114.) Plaintiff was able to lift light to medium weights and manage most of his personal care. (R. 115.) He could also sit for one hour at a time and travel for over two hours, but stand for no more than 10 minutes. (R. 115.) This testimony was inconsistent with allegations that he was completely disabled for two weeks at a time. (R. 115.)

The ALJ afforded significant weight to treating physiatrist Dr. Douglass "as he had numerous visits with [Plaintiff] and as his opinion is consistent with the medical evidence as a whole." (R. 115.) Dr. Douglass opined that Plaintiff "could perform work at a sedentary level, lifting 10 pounds occasionally, but with the need to change positions frequently." (R. 115.) Dr. Douglass further opined that the claimant should not climb ladders or perform repeated bending or twisting. (R. 115.) Dr. Douglass further opined that Plaintiff should perform no jarring activities. (R. 115.) The ALJ did not assign Dr. Douglass's opinion controlling weight, as the ALJ's RFC determination limited Plaintiff "to an even greater extent with respect to postural activities based on a combination of [his] impairments and other medical opinions." (R. 115.)

The ALJ also afforded significant weight to neurologist Dr. Rudd's opinion. (R. 115.) Dr. Rudd concluded that Plaintiff "should not lift more than 36 pounds and that he should only occasionally twist and bend." (R. 115.) The ALJ noted that Dr. Rudd indicated that surgery was not recommended because Plaintiff's back degeneration was my no means severe enough to warrant a fusion or any other intervention. (R. 115.) The ALJ further noted that Dr. Rudd's expert opinion "was based on the objective evidence of both an EMG and MRI, as well has his examination of" Plaintiff. (R. 115.)

The ALJ gave some weight to the opinion of Plaintiff's general physician, Dr. Wagner. (R. 115.) Dr. Wagner opined that Plaintiff was limited to sedentary activities, needed to shift from sitting, standing or walking as frequently as needed, and needed to avoid repetitive tasks involving twisting and bending, as well as jarring activities. (R. 115.) The ALJ generally found similar limitations to be appropriate in his RFC. (R. 115.)

The ALJ gave no weight to Dr. Wagner's opinion that Plaintiff would miss three days or more per month due to back flare-ups, however, because that portion of Dr. Wagner's opinion was not supported by the evidence. (R. 115-16.) Specifically, the ALJ noted that shortly after Plaintiff's accident, his back condition improved such that numerous doctors opined that he could return to sedentary work with some restrictions. (R. 116.)

The ALJ also gave some weight to the opinion of State Agency medical consultant Dr. Salmi. (R. 116.) Dr. Salmi opined that Plaintiff "could lift/carry 20 pounds occasionally and 10 pounds frequently and that he could stand/walk for 2 hours in a workday and six for approximately 6 hours in a workday." (R. 116.) Dr. Salmi further opined that Plaintiff "was limited to no more than occasional stooping, kneeling, crouching, crawling or climbing ladders, ropes or scaffolds, but that [Plaintiff] could frequently balance and climb ramps and stairs." (R. 116.) The ALJ found Dr. Salmi's opinion to be "generally consistent with the record," but imposed greater limitations in his RFC determination based on other opinions and giving Plaintiff the benefit of the doubt. (R. 116.)

The ALJ noted that "[t]he objective evidence supports and is not inconsistent with" the above-determined RFC. (R. 117.) Although Plaintiff was not diagnosed with obesity, a then-recent examination showed his body-mass index ("BMI") to indicate Level II obesity, and the ALJ factored this objective medical evidence into his RFC determination. (R. 117.)

The ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national

economy that Plaintiff can perform. (R. 118.) Given Plaintiff's RFC and additional limiting factors, the ALJ agreed with the vocational expert's testimony that Plaintiff would be able to perform the requirements of cashier and gate guard. (R. 118-19.) The ALJ ultimately found that Plaintiff was not disabled and denied his claim. (R. 119.)

### H. Additional Relevant Facts

Plaintiff saw Dr. Wagner again on November 8, 2010, complaining of shoulder pain and weakness following a fall. (R. 940-41.) An MRI arthrogram on November 9, 2010, revealed AC arthrosis and a probable superior labral tear. (R. 938.) Plaintiff received corticosteroid injections from an orthopedist on November 18, 2010. (R. 937-38.) At a follow up appointment on December 16, 2010, Plaintiff declined physical therapy and surgical consultation. (R. 936.) On February 3, 2010, Dr. Wagner increased Plaintiff's Lortab dose from 5 to 10 and initiated an opioid agreement. (R. 934-35.)

On May 31, 2011, Plaintiff filed a Request for Reconsideration of the ALJ's October 25, 2010 decision. (*See* R. 1174.) On July 7, 2011, Plaintiff underwent a psychological evaluation by licensed psychologist James W. Huber, Ph.D. (R. 992-97.) Plaintiff drove himself to the appointment and arrived on time. (R. 992.) When asked what his disability is, Plaintiff replied that it was his back and shoulders and that it affects everything in his daily living. (R. 992.) Plaintiff stated that he had been putting off surgery on "the 2 bottom discs" because he is "just scared of surgery." (R. 992.)

When asked why he was referred to a psychologist for evaluation, Plaintiff said it was because "[he] put down depression" in his paperwork. (R. 993.) Plaintiff's history of psychiatric hospitalization was "for 3 days following an event in which he had gone out

into the woods with a gun to kill himself and the police found him there and took him to the hospital. He denied any history of outpatient psychotherapy or severe emotional traumas although he has been affected by his brother having to serve 2 life sentences for killing 2 people while taking 2 antidepressants." (R. 993.) When asked about his plans for the future, Plaintiff said, "Hopefully get better but I know I won't get better unless I do something about it -- I know I have to have the shoulder surgery." (R. 993.)

With respect to Plaintiff's mental status, Huber's evaluation of Plaintiff was as follows:

> He came to my office by himself, walking very slowly and using a cane. . . . He was dressed cleanly in appropriate casual clothing. . . . He was pleasant, cooperative and appropriate, interacted well, and good rapport appeared to be established and maintained. He looked a little nervous at first but he made good eye-contact, spoke with soft volume and moderate pace, and elaborated his responses adequately. His affect was quite lo-key but he showed some sense of humor. He appeared to put in a good effort on the cognitive tasks I asked him to do.

> . . . His thinking appeared to be clear, relevant, coherent, goal-directed and spontaneous.

> . . . He denied having hallucinations or delusions but he has constant suidical ideation. . . . He denied any history of self-mutilation. He does not get stuck brooding but for the last [one and a half] years his general attitude has gotten more negative and his self-esteem has lowered. . . .

> . . . On a scale on which 1 is suicidal, 10 is ecstatic and 5 is neutral, he said his mood is usually around 5 but once or twice a week it goes down to 2-3. . . . He denied having manic symptoms. He does not get stuck in bed simply due to depression but he said within every 2 months he has 4-5 days when his back goes out and he cannot get out of bed or off the toilet without his wife helping him. . . . His attention and concentration are adequate when his interest is engaged but poor otherwise. . . . He has spontaneous crying spells a couple of

times a month. He denied having general problems with anxiety, only when he is going every 3 months to have the procedure done to check on the condition of his bladder. . . . He averages 6 hours of sleep at night and it is non-restorative but his nap in the afternoon is helpful. . . . He denied problems with handling money or with gambling.

. . . He had to ask me today's date when signing an initial form but he was otherwise oriented. . . . I estimate his level of intellectual functioning to be in the Average range with a possible Mathematics Disorder.

(R. 994-95.) Huber continued, "I have no medical evidence that psychological factors play a prominent role in the generation and/or maintenance of his chronic pain." (R. 995.)

Huber's medical sources statements provides:

[Plaintiff] appears able to understand and follow at least relatively simple instructions but with multiple reminders. His ability to sustain attention and concentration is markedly impaired if his interest-level is low regarding what he is doing. His ability to consistently carry out work-like tasks with reasonable persistence and pace is markedly impaired. He appears able to respond appropriately to only brief and superficial contacts with coworkers and supervisors, and he can tolerate only relatively low levels of stress and pressure in the workplace.

(R. 996.)

On October 29, 2011, Plaintiff received notice that the State Agency's benefits determination regarding his second applications had been revised and that he was entitled to monthly disability benefits beginning April 2011. (R. 1177.)

## I. Appeals Council Reopens and Revises Benefits Determination

On June 8, 2012, the Appeals Council notified Plaintiff that it was reopening the State Agency's favorable benefits determination dated October 12, 2011, because the Council "found that there is new and material evidence and the decision is contrary to the

weight of all the evidence now in the record." (R. 260.) The Appeals Council noted that the ALJ determined on October 25, 2010, that Plaintiff had not been disabled since the alleged onset date of April 1, 2006. (R. 261.)[1] "In contrast, the State Agency determined that Plaintiff was disabled since October 26, 2010, one day after the [ALJ] issued the hearing decision." (R. 262.) The Appeals Council noted that the later "determination that [Plaintiff] was disabled is based primarily on a suicide attempt on September 22, 2010 and a July 7, 2011 consultative examination report." (R. 262.)

The Appeals Council also noted that "[t]he record that was before the [ALJ] did not contain any complaints of depressive symptoms or mental health treatment" other than Plaintiff's statements that he had problems with attention when balancing his checkbook and one medical report stating "[Plaintiff] had a history of depression in 2006." (R. 262.) "Though [Huber's] opinion supports the State Agency's determination, the consultative examination was essentially normal except for subjective complaints of intermitted depression and passive suicide ideation and poor results of a very limited mental status examination." (R. 263.) The Appeals Council also noted that "the evidence available does not substantially support that [Plaintiff has] ongoing mental limitations that would prevent full-time work." (R. 263.)

The Appeals Council found that the State Agency's disability determination was not substantially supported by the evidence of record. (R. 263.) On August 14, 2012, the Appeals Council ordered Plaintiff's case remanded to the ALJ with the following

---

[1] The Appeals Council Notice provides that the ALJ hearing decision was issued on October 25, 2010, (R. 260), and October 25, 2011 (R. 261). Upon review of the Notice as well as the entire record in this matter, the Court determines that the reference to the October 25, 2011 hearing decision in the Appeals Council Notice is an unintentional typographical error.

instructions to: (1) obtain additional evidence concerning Plaintiff's mental impairments in order to complete the administrative record; (2) further evaluate Plaintiff's mental impairment in accordance with the applicable code and regulations; (3) give further consideration to Plaintiff's maximum RFC during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. (R. 164-67.)

### J. ALJ Remand Video Hearing

A remand video hearing was held before the ALJ on December 5, 2012. (R. 34-70.) Plaintiff testified about his condition as follows: He is able to drive a vehicle only short distances. (R. 43-44.) If he took it easy, he could probably walk four blocks. (R. 45.) Plaintiff had consulted with an orthopedic surgeon to discuss surgery to fix his back problems; the doctor proposed fusing two vertebrates, but he was afraid that it would start climbing to other vertebrates. (R. 45-46.) Plaintiff also stated that the surgeon wanted Plaintiff to have surgery on both shoulders, but that Plaintiff had not pursued that surgery because he was scared. (R. 46.) His cancer had not returned. (R. 46.) Plaintiff testified to taking medication for depression and anxiety. (R. 48.)

Plaintiff testified that he had been experiencing low energy, fatigue, and difficulty concentrating before a suicide attempt in September 2010. (R. 50.) For a while, Plaintiff would only talk to his oldest son about any anxiety or depression he was experiencing. (R. 50.) Plaintiff speaks with Matt almost every day. (R. 53.) Plaintiff would also speak

with his psychologist Dr. Huber because he was told that anything they talked about would remain private. (R. 51.) Plaintiff had been prescribed Xanax for anxiety in 2004. (R. 51-52.) He takes one Xanax almost every day of the week. (R. 51-52.) In 2006, Dr. Douglass prescribed Plaintiff amitriptyline, an antidepressant, for pain and sleep. (R. 55.)

Matt Carpenter, Plaintiff's eldest son, testified. (R. 57-63.) Matt testified that he speaks to Plaintiff on a daily basis. (R. 57.) Matt has been worried about his father's mental health from 2006 going forward, and has contacted Plaintiff's health provider out of concern. (R. 58-59.)

Dr. Bernice Butler testified as a medical expert. (R. 59-63.) Dr. Butler testified that she reviewed the available medical evidence and noted that Plaintiff had been diagnosed with depression. (R. 59-60.) Plaintiff had not been formally diagnosed with anxiety. (R. 60-61.) Based on the medical records, Dr. Butler opined that Plaintiff's activities of daily living are moderately impaired, his social functioning was moderately impaired, and his concentration, pace, and persistence were moderately impaired. (R. 61-62.) Dr. Butler noted that the record showed no episodes of decompensation of extended duration and that Plaintiff had been briefly hospitalized in September 2010 for having suicidal ideation. (R. 62-63.) Dr. Butler opined that Plaintiff's impairments are severe but do not meet or equal any listed impairments. (R. 63.) Dr. Butler further opined that she would limit Plaintiff's work setting to unskilled through semi-skilled work "where there would be no rapid pace, no high production goals," and "brief superficial contact with others." (R. 63.)

Edward J. Utities testified as a vocational expert. (R. 63-69.) The ALJ presented Utities with several hypothetical individuals, each with limitations similar to those testified to by Plaintiff. The first hypothetical assumed an individual of Plaintiff's age, education and work experience "limited essentially to a sedentary RFC, both as to lifting and time on feet, and he would have to have a sit/stand option. He shouldn't, more than occasionally, do things like stooping, and kneeling, and crouching, and crawling, and would be reduced to occasional use of ladders, ropes, and scaffolds, but could frequently balance and use ramps or stairs." (R. 66.) Utities testified that an individual with those limitations could perform "many of the bench work assembly occupations, non-assembly line occupations with smaller objects," such as final assembler, fishing reel assembler, and lampshade assembler. (R. 67.) Utities testified that a significant number of those jobs existed in the national economy and in the state of Minnesota. (R. 67.) Utities further testified that an individual with those limitations could perform sedentary, unskilled occupations such as sorter or addresser. (R. 67.) Utities testified that a significant number of those jobs existed in the national economy and in the state of Minnesota. (R. 67.)

The ALJ's second hypothetical assumed an individual identical to the first hypothetical, but further limited as follows: he would have to shift from sit to stand to walk frequently; would have to avoid repetitive tasks involving twisting and bending and avoid jarring activities. (R. 68.) Utities testified that the occupations he previously identified would not include repetitive twisting, bending or jarring. (R. 68.) Utities further testified that those jobs would allow one to stand for a short period and then return to a seated position, and a person could reasonably expect one vacation and one sick day per

month. (R. 68.) Utities further testified that if such a hypothetical individual were further limited to occasionally reaching, handling or fingering, he would not be able to perform any of those occupations. (R. 69.)

### K. ALJ's Second Decision

On February 1, 2013, the ALJ issued a decision denying Plaintiff's applications. (R. 8-33.) The ALJ found as follows: Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011. (R. 14.) Plaintiff had not engaged in substantial gainful activity since April 1, 2006. (R. 14.) Plaintiff has the following severe impairments: obesity; history of bladder cancer with treatment (non-invasive transitional cell carcimona) and no recurrence; degenerative disk disease of the lumbar spine; degenerative changes of the shoulders; depression; and symptoms of anxiety. (R. 14.)

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.) Specifically, the ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." (R. 14.) The ALJ considered Listing 1.02, major dysfunction of a joint(s), and found that the evidence did not demonstrate compromise of a nerve root or spinal cord along with the necessary additional finding of (a) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied

by sensory or reflex loss and, positive straight leg raising, or; (b) spinal arachnoiditis; or (c) lumbar spinal stenosis resulting in pseudoclaudication. (R. 14.)

The ALJ further determined that Plaintiff's mental impairments, "considered singly and in combination, do not meet or medically equal" the listing criteria. (R. 15.) The ALJ noted that Plaintiff has a mild restriction in daily living, and moderate difficulties in both social functioning and concentration, persistence or pace. (R. 15.) Despite these problems, however, he was able to drive short distances, was independent in his personal care, and was able to manage his finances, cook on occasion, and run short errands. (R. 15.) The ALJ also noted that Plaintiff has experienced no episodes of decompensation for periods of extended duration. (R. 15.) Further, the ALJ noted that there is no evidence that Plaintiff suffered from (1) repeated episodes of decompensation; (2) a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement. (R. 16.)

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he "must have a sit/stand option with no more than occasional stooping, kneeling, crouching, crawling or climbing ladders, ropes or scaffolds." (R. 16.) The ALJ's RFC determination further limited Plaintiff to "frequent balancing and climbing of ramps and stairs," "unskilled to semi-skilled work with no rapid pace or high production requirements," and "brief and superficial contact with others." (R. 16.)

The ALJ reviewed testimony concerning Plaintiff's symptoms, assessed the credibility of Plaintiff's statements and the credibility of other witnesses, and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" to the extent they were inconsistent with the ALJ's functional capacity assessment. (R. 19.) The ALJ cited specific examples from the record that were inconsistent with Plaintiff's testimony and the testimony of his son and mother-in-law, including: (1) Plaintiff could walk four blocks if he took it easy and stopped; (2) Plaintiff was noted to be self-sufficient with daily functioning and a normal attention span and memory even during his psychiatric hospitalization; and (3) Plaintiff was noted to have a normal gait during his psychiatric hospitalization and there was no mention of him requiring use of a cane, crutches, or walker. (R. 18-19.)

The ALJ afforded significant weight to treating physiatrist Dr. Douglass "as he had numerous visits with [Plaintiff] and as his opinion is consistent with the medical evidence as a whole." (R. 19.) Dr. Douglass opined that Plaintiff "could perform work at a sedentary level, lifting 10 pounds occasionally, but with the need to change positions frequently." (R. 19.) Dr. Douglass further opined that the claimant should not climb ladders or perform repeated bending or twisting. (R. 19.) Dr. Douglass further opined that Plaintiff should perform no jarring activities. (R. 19.) The ALJ did not assign Dr. Douglass's opinion controlling weight, as the ALJ "limited [Plaintiff] to an even greater

extent with respect to postural activities based on a combination of [his] impairments and other medical opinions." (R. 19.)

The ALJ also afforded significant weight to neurologist Dr. Rudd's opinion. (R. 19.) Dr. Rudd concluded that Plaintiff "should not lift more than 36 pounds and that he should only occasionally twist and bend." (R. 19.) The ALJ noted that Dr. Rudd's expert opinion "was based on the objective evidence of both an EMG and MRI, as well has his examination of" Plaintiff. (R. 19.)

The ALJ gave some weight to the opinion of Plaintiff's general physician, Dr. Wagner. (R. 19.) Dr. Wagner opined that Plaintiff was limited to sedentary activities, needed to shift from sitting, standing or walking as frequently as needed, and needed to avoid repetitive tasks involving twisting and bending, as well as jarring activities. (R. 19.) The ALJ gave no weight to Dr. Wagner's opinion that Plaintiff would miss three days or more per month due to back flare-ups, however, because that portion of Dr. Wagner's opinion was not supported by the evidence. (R. 19-20.) Specifically, the ALJ noted that shortly after Plaintiff's accident, his back condition improved such that numerous doctors opined that he could return to sedentary work with some restrictions. (R. 20.)

The ALJ also gave some weight to the opinion of State Agency medical consultant Dr. Salmi. (R. 20.) Dr. Salmi opined that Plaintiff "could lift/carry 20 pounds occasionally and 10 pounds frequently and that he could stand/walk for 2 hours in a workday and six for approximately 6 hours in a workday." (R. 20.) Dr. Salmi further opined that Plaintiff "was limited to no more than occasional stooping, kneeling, crouching, crawling or climbing ladders, ropes or scaffolds, but that [Plaintiff] could

frequently balance and climb ramps and stairs." (R. 20.) The ALJ found Dr. Salmi's opinion to be "generally consistent with the record," but imposed greater limitations in his RFC determination based on other opinions and giving Plaintiff the benefit of the doubt. (R. 20-21.)

The ALJ gave great weight to Dr. Butler's opinion that Plaintiff could perform unskilled to semi-skilled work with no rapid pace or high production goals, with no more than brief and superficial contact with others. (R. 23.) Dr. Butler opined that Plaintiff's activities of daily living were moderately impaired, noting that Plaintiff was able to drive short distances, watch television, run certain errands, manage his own finances, and cook occasional meals. (R. 22.) Dr. Butler opined that Plaintiff's social functioning and concentration, persistence or pace were moderately limited. (R. 22.) The ALJ noted that Dr. Butler reviewed all of Plaintiff's records, carefully considered Plaintiff's statements, and assessed Plaintiff's impairments in light of her special knowledge. (R. 23.) The ALJ also noted that Dr. Butler's opinion was "consistent with the record as a whole." (R. 23.)

The ALJ found that Plaintiff was unable to perform any past relevant work. (R. 24.) Considering Plaintiff's age, education, work experience, and RFC, however, the ALJ determined that jobs exist in significant numbers in the national economy that Plaintiff can perform, including final assembler, fishing reel assembly, lampshade assembler, sorter, and dresser. (R. 24-25.) Ultimately, the ALJ found that Plaintiff was not disabled and denied his claim.

## III.  ANALYSIS

### A.  Standard of Review

Review by this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf*, 3 F.3d at 1213. Rather, the Court "must consider both evidence that supports and evidence that detracts from the [ALJ's] decision" and "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). If it is possible to reach two inconsistent positions from the evidence, then the court must affirm the ALJ's decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. § 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1520(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### B. Appeals Counsel Lacked Good Cause To Reopen the October 2011 Determination

Plaintiff first argues that the Appeals Council did not have jurisdiction to reopen the State Agency's October 2011 favorable benefits determination. Federal regulations allow a determination to be reopened

> (a) within 12 months of the date of the notice of the initial determination, for any reason;

30

        (b) within four years of the date of the notice of the initial
            determination if we find good cause as defined in § 404.989,
            to reopen the case; or
        (c) at any time if [certain conditions are met].

20 C.F.R. § 404.988. "Good cause" exists under § 404.989 if (1) new and material evidence is furnished; (2) a clerical error occurred in the computation or recomputation of benefits; or (3) the evidence that was considered in making the determination clearly shows on its face that an error was made. The error justifying reopening may be either factual or legal in nature. *Reddington v. Bowen*, 640 F. Supp. 1005 (E.D.N.C. 1986); *Fox v. Bowen*, 835 F.2d 1159 (6th Cir. 1987). Whether evidence qualifies as new and material is a question of law subject to de novo review. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Evidence is new if "it was not before the decisionmaker when the previous determination was made." *Marshal v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996). Evidence is material if "the Secretary's decision might reasonably have been different had the new evidence been before him at the time of the decision." *Falu v. Sec'y of Health and Human Servs.*, 703 F.2d 24, 27 (1st Cir. 1983).

    The June 8, 2012 Appeals Council's Notice states that the Appeals Council granted Plaintiff's request for review of the ALJ's October 25, 2010 decision because it "found that there [was] new and material evidence and the decision is contrary to the weight of all the evidence now in the record." R. 260. With respect to the State Agency's October 12, 2011 favorable determination, the Appeals Council Notice provides that the rules allowed it to reopen the State Agency's favorable determination because it was within 12 months of the date of the notice of the initial determinations. R. 261.

Defendant, however, concedes that the initial determinations underlying the State Agency's favorable determination were made on April 29, 2011. *See* Def.'s Mem. in Supp. of Mot. for Summary Judgment, ECF No. 22, at 6 ("Plaintiff is correct that the Appeals Council could not have, in June 2012, reopened the October 2011 favorable determination under § 404.988(a)."). Defendant instead asserts that it reopened the State Agency's October 2011 determination for good cause under § 404.988(b)—specifically, because the Appeals Council had received new and material evidence contrary to the decision. (Def.'s Mem. in Supp. at 6-7.)

Defendant's argument to support finding good cause is unpersuasive. For starters, neither Plaintiff's September 2010 suicide attempt nor Huber's July 2011 consultative opinion was new evidence with respect to the State Agency's October 2011 determination. Both the September 2010 suicide attempt and Huber's July 2011 consultative examination were before the State Agency when it issued its October 2011 benefits determination. *See Marshall*, 75 F.3d at 1426 (determining that earnings records withheld from SSA examiner before determining claimant remained eligible to receive benefits were new evidence because they were not before the decisionmaker); *Dugan v. Sullivan*, 957 F.2d 1384, 1390 (7th Cir. 1992) (holding that evidence was not new because it was already in SSA's possession when it made the initial determination). This is not a situation where a claimant "came across new medical evidence regarding his disability while his claim was still on direct review." *Sherrod v. Chater*, 74 F.3d 243, 246 (11th Cir. 1996). The "new and material evidence" with which Defendant seeks to justify its reopening of the State Agency's October 2011 favorable benefits determination is the

very same evidence on which the State Agency's October 2011 favorable benefits determination was based. In short, the evidence simply is not new.

The Court determines that no "new and material evidence" was furnished to justify reopening the State Agency's October 2011 favorable benefits determination. As such, Defendant lacked the authority under 20 C.F.R. § 404.988 to reopen the favorable benefits determination. Accordingly, the August 14, 2012 decision of the Appeals Council to reopen the State Agency's October 2011 benefits determination should be reversed, and the State Agency's October 2011 benefits determination should be reinstated.

### C. ALJ's February 2013 Denial of Benefits Determination

The Court now turns to the ALJ's February 2, 2013 decision. Plaintiff argues that (1) the ALJ failed to fully and fairly develop the record; (2) the ALJ failed to recognize the increasing severity of Plaintiff's impairments; and (3) the ALJ's hypothetical questions to the vocational expert were invalid.

#### 1. ALJ Fairly Developed the Record

Plaintiff asserts that the ALJ failed to develop the record fully. Generally, claimants bear the burden of presenting evidence supporting a finding of disability. *See* 20 C.F.R. §§ 404.1512(a), (c), 416.912(a), (c); *accord Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) ("[T]he fact that Whitman appeared pro se does not relieve him of the burden to establish disability.); *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994) ("[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record."). The ALJ, however, has undertaken a duty to

develop a sufficient record to resolve a claim when necessary. *Id.* §§ 404.1512(d)-(f), 404.1520b, 416.912(d)-(f), 416.920b; *accord Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010). In performing that duty, the ALJ must sometimes obtain evidence, re-contact treating sources, or order consultative examinations. 20 C.F.R. §§ 404.1512(e), 404.1517, 404.1519a-b, 416.912(e), 416.919a-b; *see also* 20 C.F.R. §§ 404.1520b(c), 416.920b(c). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citing *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)).

The ALJ's duty, then, is to ensure that "evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). "Furthermore, reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001) (quotation and citation omitted); *see also Shinseki v. Sanders*, 556 U.S. 396, 409 (citing *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997)) (reviewing ALJ's failure to develop record under harmless error standard).

Plaintiff first argues that the ALJ failed to obtain additional evidence concerning Plaintiff's mental impairments as ordered by the Appeals Council's August 2012 Order remanding the case. (Pl.'s Mem. in Supp., ECF No. 18, at 32-34.) The Appeals Council's August 2012 Order stated that on remand, the ALJ would "[o]btain additional evidence concerning the claimant's mental impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations

and existing medical evidence (20 C.F.R. 202.1512-1513 and 416.912-913). The additional evidence may include, if warranted and available, another consultative mental status examination with more extensive psychological testing and medical source statements about what the claimant can still do despite the impairment." (R. 166.)

First, the Appeals Council's August 2012 order does not require the ALJ to obtain a new consultative mental status examination. Unlike the Appeals Council's direction to the ALJ to obtain "evidence from a psychiatric medical expert to assist in clarifying the nature and severity of [Plaintiff's] impairment," (R. 167), the order is permissive when addressing whether the ALJ should obtain another consultative mental status examination. In addition to the evidence in the record, the ALJ heard testimony of medical expert Karen Butler, Ph.D. (R. 59-63.) Butler found the record adequate to opine on Plaintiff's mental impairments and had no questions for Plaintiff at the December 5, 2012 hearing. (R. 60.) In his opinion, the ALJ gave Butler's opinion great weight in light of her review of Plaintiff's records, her "special knowledge in assessing impairments within the SSA disability standard," and the fact that her opinion was consistent with the record as a whole. (R. 22-23.) Moreover, in addition to Butler's testimony, the ALJ obtained and considered the medical records of Plaintiff's September 2010 psychiatric hold and the July 2011 psychological consultative examination, evidence which had not previously been put before the ALJ. (R. 23.) Accordingly, the Court determines that the ALJ complied with the Appeals Council's order to obtain additional evidence concerning Plaintiff's mental impairments.

Plaintiff also argues that the ALJ failed to develop the record fairly because he should have questioned Plaintiff more extensively regarding his mental impairments and he unreasonably cut short the questioning of Plaintiff's son. During Plaintiff's testimony at the December 5, 2012 hearing, the ALJ told Plaintiff's counsel that they were "running a little short of time," advised that counsel should "[p]ick the best questions" before they called Plaintiff's son to testify, and mentioned that accepting Plaintiff's son's testimony in writing might best accommodate the ALJ's scheduling concerns. (R. 55.) Plaintiff's counsel immediately ended Plaintiff's direct examination and called Plaintiff's son to offer his testimony. (R. 55-56.) The hearing transcript shows that the ALJ did question Plaintiff about his mental impairments. The ALJ specifically noted that Plaintiff had been offered antidepressants after his September 2010 hospitalization and asked whether Plaintiff had suffered any similar episodes. (R. 49.) The transcript also shows that Plaintiff's counsel was allowed to introduce Plaintiff's son's testimony without interruption, and Plaintiff's counsel ended Plaintiff's son's testimony of her own accord. (R. 56-59.)

In accordance with the Appeals Council's August 2012 order, the ALJ obtained additional evidence regarding Plaintiff's mental impairments and testimony from a psychiatric medical expert. Accordingly, this Court determines that the ALJ fully and fairly developed the record.

## 2. **Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff next asserts that the ALJ erred in making his RFC determination by (1) failing to appreciate the escalating nature of Plaintiff's impairments, and (2) not

including all limitations shown by the record in his hypothetical questions to the vocational expert.

### a. ALJ's Determination of Limitations

Plaintiff first argues that the ALJ's RFC determination in his February 2013 decision did not accommodate changes in his symptoms that had occurred since the ALJ issued its October 2010 decision. An RFC determination is made at step four, "where the burden of proof rests with the claimant," *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000), and must be "based on all the relevant evidence in [a claimant's] case record," taking into consideration both medical and nonmedical evidence. 20 C.F.R. §§ 404.1545(a)(1), (3) & (b), 416.945(a)(1), (3) & (b); *accord Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010). "[T]he record must include some medical evidence that supports the ALJ's [RFC] finding." *Dykes v. Apfel*, 223 F.3d 865, 967 (8th Cir. 2000). Claimants bear the burden of demonstrating functional limitations that must be incorporated into the ALJ's RFC determination. *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).

The ALJ thoroughly reviewed Plaintiff's entire medical history, including the additional documentation offered in advance of the December 2012 hearing. The ALJ found that Plaintiff's medically determinable impairments could reasonably cause his alleged symptoms, but determined that Plaintiff's testimony of the intensity, persistence and limiting effects of his symptoms was not credible to the extent it was not consistent with the objective medical evidence and other evidence. (R. 19.) The lifting limitations set forth in the RFC are stricter than necessary to comply with Dr. Douglass's opinion,

Dr. Rudd's opinion, and Dr. Salmi's opinion. To accommodate the objective medical evidence documenting changes in MRIs of Plaintiff's spine, the ALJ limited Plaintiff to a reduced range of sedentary exertion. To accommodate Plaintiff's shoulder injury, the ALJ included a limitation of no climbing ladders, ropes or scaffolds.

The ALJ considered the record as a whole and found that Plaintiff was capable of performing sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 426.967(a) with a certain restrictions. The record contains sufficient medical evidence to support this determination. *Jones*, 619 F.3d at 971. Whether or not other evidence in the record *could* support a different finding, *see Woolf*, 3 F.3d at 1213, the ALJ's RFC determination is supported by substantial evidence in the record.

Plaintiff next argues that the ALJ erred by not including Dr. Douglass's repeated finding that Plaintiff needed to sit, stand, and move in his questions to the vocational expert. The ALJ gave significant weight to Dr. Douglass's opinion, but not controlling weight, because the ALJ's RFC "limited [Plaintiff] to an even greater extent with respect to postural activities" than Dr. Douglass did. (R. 19.) The ALJ's RFC determination did not include a need to walk. Based on the record, however, the Court concludes that the ALJ did not err in failing to include a walking requirement in his RFC determination. The ALJ identified the proper legal framework and considered evidence (at times contradictory) that was relevant to whether Plaintiff suffered from postural or manipulative limitations. After canvassing the several and conflicting opinions as to Plaintiffs RFC, the ALJ noted that his RFC determination is supported by the objective evidence. Plaintiff's MRIs revealed significant findings with a generally mild degree of

abnormality, and the RFC accommodated these findings by limiting Plaintiff to a reduced range of sedentary work. The ALJ also noted that Plaintiff sought very little treatment for his back condition since 2010 and reportedly had adequate pain control in August 2012. Based on the foregoing, the Court concludes that the ALJ's implicit finding that Plaintiff did not require a need to walk in his RFC was supported by substantial evidence.

Plaintiff also argues that the ALJ erred by not including in his RFC determination an accommodation for back pain flare-ups that would require Plaintiff to miss three or more days of work per month. The ALJ considered Dr. Wagner's opinion that Plaintiff would miss three days or more per month and found that it was not supported by the evidence. The ALJ noted that Plaintiff's lower back pain showed some improvement after one month and a vocational rehabilitation case manager noted that claimant was able to perform most activities of daily life. During the same timeframe, Dr. Rudd noted that objective medical evidence did not match Plaintiff's symptoms and that Dr. Douglass opined that Plaintiff could perform sedentary work with some postural limitations. Importantly, the ALJ relied on objective medical evidence to find that Dr. Wagner's opinion that Plaintiff would miss three or more days of work a month was entitled to no weight. Accordingly, the Court concludes that this determination is supported by substantial evidence.

Finally, Plaintiff asserts that the ALJ should have included a marked limitation in concentration, persistence, and pace in his RFC determination. Specifically, Plaintiff argues that the ALJ erred in evaluating Plaintiff's mental limitations by (1) finding Plaintiff's unwillingness to speak with his doctor about depression to undermine his

39

credibility, and (2) affording Huber's July 2011 opinion insufficient weight. "The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Gwalthey v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (citation omitted). When evaluating the credibility of a claimant's subjective complaints, the ALJ

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by the third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. The [ALJ] is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole, but he must give reasons for discrediting the claimant." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (internal quotations and citations omitted). "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990). If an inconsistency in the record exists, the ALJ is entitled to resolve any inconsistencies in a manner that is supported by substantial evidence in the record as a whole. *Dunlap*, 649 F.2d at 641.

The ALJ gave little weight to Huber's finding in July 2011 that Plaintiff's attention and concentration were markedly impaired if his interest was low and that he

was markedly limited in carrying out work-like tasks with reasonable persistence and pace. The ALJ determined that this finding was not supported by the record. Specifically, the ALJ noted that even during Plaintiff's brief hospitalization for suicidal ideation, the record showed that Plaintiff's attention and concentration were normal and he had no memory impairment. The ALJ also noted that Plaintiff did not seek treatment for depression, and "[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995). Based on the foregoing, the Court determines that the ALJ's decision not to include a marked limitation in concentration, persistence and pace in his RFC determination is supported by substantial evidence in the record.

### b. ALJ's Hypothetical Questions Supported by Substantial Evidence

The Court now turns to Plaintiff's challenge to the ALJ's hypothetical questions to the vocational expert. An ALJ's hypothetical question is sufficient if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Davis*, 239 F.3d 962, 966 (8th Cir. 2001). An ALJ's hypothetical question must appropriately account for the limitations supported by the evidentiary record. *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008). An ALJ cannot "disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). The ALJ is entitled to resolve any inconsistencies in the record in a manner that is supported by substantial evidence in the record as a whole. *Dunlap*, 649 F.2d at 641.

The ALJ presented Utities with two hypothetical individuals. The first hypothetical assumed an individual of Plaintiff's Age, education and work experience "limited essentially to a sedentary RFC, both as to lifting and time on feet, and he would have to have a sit/stand option. He shouldn't, more than occasionally, do things like stooping, and kneeling, and crouching, and crawling, and would be reduced to occasional use of ladders, ropes, and scaffolds, but could frequently balance and use ramps or stairs." (R. 66.) The second hypothetical assumed an individual identical to the first hypothetical, but further limited as follows: he would have to shift from sit to stand to walk frequently; would have to avoid repetitive tasks involving twisting and bending and avoid jarring activities. (R. 68.) Utities testified that both hypothetical individuals could perform the obligations of certain occupations that exist in a substantial number in Minnesota and the national economy.

In determining Plaintiff's RFC, the ALJ did not consider one opinion to be controlling; rather, he gave different opinions varying amounts of weight and compiled Plaintiff's RFC by looking at all of the different opinions. The limitations that he included in his hypothetical questions to the Utities are supported by substantial evidence in the record. Whether or not other evidence in the record *could* support a different finding, *see Woolf*, 3 F.3d at 1213, the ALJ's RFC determination is supported by substantial evidence in the record. Accordingly, the Court determines that the ALJ's hypothetical questions to the vocational expert were valid.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that

1. Plaintiff's Motion for Summary Judgment (ECF No. 17) and Defendant's Motion for Summary Judgment (ECF No. 21) be **GRANTED IN PART** and **DENIED IN PART** as set forth above;

2. The decision to reopen the October 12, 2011 benefits determination be **REVERSED** and the benefits determination be **REINSTATED**; and

3. This action be **DISMISSED.**


Date:  July 27, 2015                                         s/ Tony N. Leung
                                                             Tony N. Leung
                                                             United States Magistrate Judge
                                                             District of Minnesota

                                                             *Carpenter v. Colvin*
                                                             File No. 14-cv-1664 (JRT/TNL)
Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation

by filing with the Clerk of Court and by serving upon all parties written objections that

specifically identify the portions of the Report to which objections are made and the basis

of each objection.   This Report and Recommendation does not constitute an order or

judgment from the District Court and it is therefore not directly appealable to the Circuit

Court of Appeals.   Written objections must be filed with the Court before **August**

**10, 2015.**